UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

PICACHO HILLS UTILITY COMPANY, INC.,

Case No. 11-13-10742 TL

Debtor.

## MEMORANDUM OPINION

The debtor Picacho Hills Utility Company, Inc. is a small water and sewer utility serving about a thousand homes in a residential development near Las Cruces, New Mexico.  Debtor and its owner ran afoul of two New Mexico regulatory agencies, the New Mexico Public Regulation Commission ("PRC") and New Mexico Environment Department ("NMED"), resulting in substantial penalties and the appointment of a state court receiver.  Shortly before a hearing on the receiver's motions to sell Debtor's assets and set aside two questionable purported transfers, Debtor filed this Chapter 11 case.

The state court receiver ("Receiver") filed a Motion to Dismiss for Bad Faith Filing (the "Motion to Dismiss"); a Motion to Abstain Pursuant to § 305 (the "Motion to Abstain"); and a Motion to Excuse Compliance with § 543(a) (the "Motion to Excuse Turnover") (together, the "Motions").  PRC, NMED, Bank of the Rio Grande ("BRG"), and Blanco Development, LLC ("BDLLC") joined in the Motions and participated in the final hearing.[1]  Debtor opposes the Motions.

The Court tried the contested matters on April 12, 15, 18, and 19, 2013.  For the reasons set forth below, the Court finds that the Receiver should be excused from turnover and that this case should be suspended until the Receiver has sold Debtor's assets.  Because of the relief

_____

1 Two other creditors, Brightview Land Company and Peter Gould, also indicated their support for the Motions.

granted to the Receiver, the Court finds that the case should not be dismissed, so Debtor can be allowed, post-sale, to liquidate and distribute its estate.

I.     FACTS

*The Debtor*

1.     Debtor, a New Mexico corporation, is a public utility as defined by N.M.S.A. § 62-3-3(G).  Debtor provides water and sewer service to approximately one thousand residences in and around the Picacho Hills development near Las Cruces, New Mexico.  Debtor is regulated by PRC and NMED.

2.     Debtor is wholly owned by Stephen C. Blanco ("Blanco"), Debtor's president.

3.     Debtor owns 2260 acre-feet-per-year ("AFY") of "permitted" water rights, set forth in permits issued by the New Mexico Office of the State Engineer ("OSE").  Of these, about 384 AFY have been put to beneficial use, and will be considered "perfected," while the balance will be considered "inchoate."

4.     NMED has issued Debtor a number of sewage wastewater discharge permits over the years, without which Debtor could not have operated the sewer utility.

5.     Discharge permits must be renewed every five years.  Debtor's 2007 discharge permit required Debtor to construct an effluent discharge pipeline to the Rio Grande as an alternative disposal method (the "Discharge Pipeline").[2]  NMED imposed a July 24, 2008 deadline to complete the Discharge Pipeline.

6.     NMED extended the deadline several times, in part due to Debtor's need to seek approval from PRC to borrow funds to construct the Discharge Pipeline.

7.     On May 8, 2009, after Debtor had missed the extended deadlines to complete the

---

[2] Currently, the only way Debtor can dispose of sewage wastewater is to treat it and pump the treated water to the Picacho Hills Country Club, where it is used to irrigate the golf course.

Discharge Pipeline several times, NMED issued a Notice of Violation that required, among other things, the Discharge Pipeline to be constructed no later than August 6, 2009.

8.      Debtor has not built the Discharge Pipeline and has no funds with which to do so. Debtor will soon be five years late in building the pipeline.

*Administrative Proceeding*

9.      On or about October 23, 2008, PRC commenced Case No. 08-00315-UT (the "Administrative Proceeding") to investigate Debtor's compliance with PRC rules and orders.

10.      The Administrative Proceeding afforded Debtor a full and fair opportunity to litigate the matters at issue.  The final hearing, conducted over four days in February, 2010, included seven witnesses and 34 exhibits.  Pre-hearing procedure, discovery, and preparation were comprehensive and took place over 15 months.

11.      On May 26, 2010, the hearing examiner Carolyn R. Glick completed her Final Recommended Decision ("FRD").[3]  The FRD is 88 pages long.

12.      The FRD is very critical of Debtor's and Blanco's actions.  The FRD finds, inter alia, that Debtor violated PRC rules or orders 42 times; and that Blanco gave false testimony, attempted to intimidate potential witnesses, and converted substantial Debtor funds.

13.      On August 12, 2010, PRC issued its Final Order in the Administrative Proceeding (the "Final Order"), adopting the hearing examiner's FRD with few exceptions.

14.      Among PRC's separate findings are:  Debtor engaged in multiple unauthorized financial transactions; Debtor failed to build the Discharge Pipeline despite repeated PRC orders; Blanco made false statements under oath; Blanco converted utility funds for personal and other uses; and Blanco engaged in acts of witness intimidation.

15.      PRC also independently found and/or concluded that Debtor is unwilling or

---

[3] Debtor sought to disqualify Ms. Glick based on alleged bias, but the effort failed.  FRD, p. 7.

unable to adequately service its customers and consistently violated PRC's rules or orders.[4]

16.    In the Final Order, PRC determined to commence an action in state court seeking the appointment of a receiver for Debtor's assets.[5]

17.    PRC also stated in the Final Order that Blanco's false statements under oath, conversion of Debtor funds, and acts of witness intimidation would be referred to the New Mexico Attorney General.

18.    Debtor appealed the Final Order to the New Mexico Supreme Court.  On September 7, 2011, the New Mexico Supreme Court affirmed the Final Order.

19.    In a Supplemental Order Imposing Additional Penalties, issued August 24, 2010 (the "Supplemental Order"), PRC assessed a $950,000 penalty against Blanco and a $15,000 penalty against Debtor.

*The Receiver Action*

20.    On September 2, 2010, BRG filed an action in the Third Judicial District Court, Dona Ana County, New Mexico, entitled *Bank of Rio Grande v. Picacho Hills Utility Company, Inc., et al.*, Case No. D-307-CV-201002416 (the "Receiver Action").  In the Receiver Action BRG seeks to collect a loan secured by a mortgage on Debtor's assets.  The case was assigned to

---

[4]  The PRC findings are binding upon this Court, under principles of collateral estoppel/issue preclusion. Collateral estoppel applies in adversary proceedings, s*ee e.g. Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991), and contested matters.  *See e.g., In re Thomas*, 2007 WL 1655669, at *5 (Bankr. S.D.N.Y. 2007); *In re Flury*, 310 B.R. 659 (Bankr. M.D. Fla. 2004).  When applying principles of collateral estoppel based on state court judgments, the bankruptcy court looks to the applicable requirements of the state in which the judgment was entered.  *See Gonzales v. Hernandez,* 175 F.3d 1202, 1204 (10th Cir. 1999) ("A federal court is required to give a state court judgment the same preclusive effect it would be given under the laws of the state in which it was rendered.") (citations omitted).  Under New Mexico law, administrative adjudications can form the basis for collateral estoppel.  *See Shovelin v. Cent. New Mexico Elec. Co-op, Inc.,* 115 N.M. 293, 298, 850 P.2d 996, 1001 (1993) ("administrative adjudicative determinations may be given preclusive effect if rendered under conditions in which the parties have the opportunity to 'fully and fairly litigate the issue at the administrative hearing'").  The Court finds that Debtor was given a full and fair opportunity to litigate before the Hearing Officer and the PRC, and that the Final Order can fairly be the basis for issue preclusion.  This finding is bolstered by the fact that Debtor appealed the Final Order to the New Mexico Supreme Court, which affirmed PRC's decision in all respects.
[5] For PRC's authority to do so, *see* N.M.S.A. § 63-13-15.

Hon. James T. Martin.  On September 7, 2010, BRG filed an application to appoint a receiver.

      21.     PRC intervened in the Receiver Action and joined BRG's receiver application.

      22.     On or about October 14, 2011, Blanco signed a letter of intent to pursue the sale of Debtor's assets to a certain David L. Hamilton for $1,300,000.

      23.     On November 14, 2011, Judge Martin entered an Order Appointing Receiver (the "Receiver Order").

      24.     The Receiver Order appointed Robert Martin (no relation to Judge Martin) the receiver and granted him the sole right to lease, market, and/or sell Debtor's assets.

      25.     On July 16, 2012, after a lengthy mediation, Blanco, Debtor, BRG, and PRC signed a Settlement Agreement.  As part of the Settlement Agreement, Blanco and Debtor "agree[d] to the sale of the Picacho Hills Utility Co (PHUC) assets by the receiver."

      26.     On August 31, 2012, Judge Martin entered a Stipulated Partial Judgment that contained the following finding: "PHUC and Blanco agree to the sale of PHUC assets by the Court appointed Receiver, Robert Martin and/or his successors or assigns."[6]

*The Proposed Sale*

      27.     At about the time the Settlement Agreement was signed, the Receiver asked Debtor's counsel (Alex Chisholm) whether Debtor would look favorably on a sale of Debtor's assets for $2,000,000.  Mr. Chisholm stated Debtor would be delighted with such a price.

      28.     The Receiver found a potential buyer, the Dona Ana Mutual Domestic Water Consumers Association (the "MDWCA").

---

[6] Consent judgments are res judicata in New Mexico. *See Myers v. Olson,* 100 N.M. 745, 748, 676 P.2d 822, 825 (1984); *Johnson v. Aztec Well Servicing Co.,* 117 N.M. 697, 700, 875 P.2d 1128, 1131 (Ct. App. 1994).  However, such judgments generally are not entitled to collateral estoppel effect where the issues involved are not actually adjudicated, and trial judge's role in signing the judgment is only ministerial. *See Pope v. Gap, Inc.,* 125 N.M. 376, 383, 961 P.2d 1283, 1290 (Ct. App. 1998).  Here, the Stipulated Partial Judgment is not a final judgment, so it is not res judicata and has no preclusive effect. *See e.g. Bounds v. Hamlett,* 150 N.M. 389, 258 P.3d 1181 (Ct. App. 2011) (only final judgment are res judicata).

29.     On September 4, 2012, the Receiver filed a "Motion for Approval of Agreement of Purchase and Sale of Assets and for Approval of Receiver's Fees and Costs" (the "Sale Motion"), seeking state court approval of the proposed sale to MDWCA.

30.     The proposed sales price is $2,250,000.

31.     Debtor and Blanco objected to the Sale Motion on September 21, 2012, arguing that the price was inadequate.

*The Challenged Conveyances*

32.     On August 31, 2012, unbeknownst to the Receiver, Blanco caused Debtor to purport to convey 1,876 AFY of Debtor's permitted water rights to an entity denoted Rio Grande Investments, LLC.[7]   On September 19, 2012, Blanco caused Rio Grande Investments, LLC to purport to convey the same water rights to Resurrection Mining, LLC ("Resurrection Mining") (together, the two purported transfers are referred to as the "Challenged Conveyances").[8]

33.     On or about October 9, 2012, after learning of the Challenged Conveyances, the Receiver filed a "non-opening" complaint in the Receiver Action, naming, inter alia, Resurrection Mining as an additional defendant and seeking to void the Challenged Conveyances.

34.     In addition, on November 27, 2012, the Receiver also filed a Motion For Order to Show Cause Why Parties Should Not be Held in Contempt and to Void Transfers of Receivership Assets (the "Contempt Motion").

35.     Resurrection Mining attempted to disqualify Judge Martin from hearing the complaint against it, but Judge Martin declined to remove himself.   Resurrection Mining

---

[7] Apparently no such entity has been formed, at least in New Mexico.
[8] The purported conveyances were via two quitclaim deeds and two Change of Ownership forms prepared at Blanco's instruction and signed by Blanco.  The documents were recorded in Dona Ana County, but the OSE refused to accept them for filing.  Resurrection Mining apparently is 22% owned by Blanco.

petitioned the New Mexico Supreme Court for a writ of mandamus enforcing the disqualification. The Supreme Court denied the petition.

36.     Hearings on the Sale Motion and the Contempt Motion were originally set for hearing on January 8, 2013, but were continued to March 11, 2013.

37.     On March 8, 2013, Debtor filed this bankruptcy case.

38.     Debtor admits it filed the case primarily "to stop a sale of the assets of Debtor for less than adequate consideration."

*Witness testimony*

*Alysia Leavett*

39.     Alysia Leavett, an NMED employee, works in the Construction Loans Bureau and manages NMED's Rural Infrastructure Loan program. Her testimony was very credible.

40.     Ms. Leavett testified that MDWCA applied to NMED for a $2 million loan to finance the purchase of Debtor's assets. NMED approved the loan request.

41.     Ms. Leavett also testified that, in addition to the purchase loan, MDWCA is qualified to borrow up to an additional $2 million from NMED to make capital improvements to Debtor.

42.     Ms. Leavett testified that for both loans to be available to MDWCA in 2013, the purchase loan must close no later than June 30, 2013, because NMED is statutorily limited to lending $2 million dollars per fiscal year to any one borrower.[9]  If MDWCA closes on the purchase loan after June 30, 2013, NMED could not loan MDWCA more money before July 1, 2014.

*Robert Martin*

43.     The Receiver testified in support of the Motions. His testimony was very

_____
[9] N.M.S.A. § 75-1-4(D).

-7-

credible.

44.     The Receiver testified that since his appointment he has diligently operated the water and sewage utilities, given the lack of capital.

45.     The Receiver testified that when he took over Debtor's operations, there was about $1,000 in Debtor's bank accounts.  The Receiver opined that Debtor's prior management depleted Debtor's bank accounts in advance of Receiver's appointment.

46.     The Receiver further testified that Debtor's only water storage tank has a leak and can only be filled about halfway.  The Receiver's opinion is that to fix the leak, Debtor would have to build a second, smaller tank, drain the leaking tank, and repair the leaking tank when it is empty and dry.

47.     Finally, the Receiver testified that Debtor is able to cash flow, but is undercapitalized and needs to spend substantial amounts to build the Discharge Pipeline, fix its water tank, and modernize its water tank, pumps, and sewage treatment system.  The Receiver characterized Debtor as able to operate day to day, but vulnerable to any significant capital demands and unable to spend the money needed to treat its sewage water as well as it should be treated.

*Dr. Barrett*

48.     Dr. Vince Barrett, Receiver's expert witness, opined that Debtor's assets are worth about $1,198,000 if sold to a buyer that would be subject to PRC regulation, and about $2,952,000 if sold to a buyer that would not be subject to PRC regulation.

49.     Dr. Barrett opined that Debtor's assets could be worth less (by an unspecified amount) if the buyer were required to build the Discharge Pipeline immediately or incur other substantial capital expenses.

-8-

50.     Dr. Barrett's opinion is that Debtor's 384 AFY of "perfected" water rights are worth about $2,000 per AFY, while Debtor's inchoate water rights have no substantial value.

51.     The Court finds that Dr. Barrett's opinions are thoughtful and credible, and gives them substantial weight.

*David Esparza*

52.     Mr. David Esparza, Debtor's expert witness, testified that Debtor has about 1867 AFY of water rights it could lease or sell, and stated or implied that the per AFY value of those water rights was about the same as the 384 AFY Debtor has put to beneficial use.[10]  If true, using Dr. Barrett's estimate of $2,000 per acre foot, the inchoate water rights could be worth about $3,750,000.

53.     The Court does not give Mr. Esparza's opinion substantial weight, for the following reasons:

        a.      Mr. Esparza is not disinterested, since he has worked for Debtor and Blanco for years, is a defendant in the Receiver Action, and may have an interest in Rio Grande Investments (the first of the Challenged Conveyances grantees);[11]

        b.      Mr. Esparza admitted he is not aware of any sales or leases of inchoate water rights in the lower Rio Grande basin;

        c.      Mr. Esparza did not address the difficulty presented by the requirement that PRC approve any water rights transfers;

        d.      Mr. Esparza's role in recommending, drafting, and submitting the Challenged Conveyances raises questions about Mr. Esparza's judgment and/or independence;

        e.      Mr. Esparza is owed about $80,000 from Debtor;

_____

[10]  Mr. Esparza was not qualified as an expert witness on the value of water rights, so his opinion about the value of Debtor's inchoate water rights is given little weight.
[11]  Mr. Esparza is described in the paperwork as the manager of Rio Grande Investments.

f.    Mr. Esparza's fee for work in these contested matters is being paid by Mr. Chisholm, Debtor's former counsel and an apparent owner of Resurrection Mining; and

g.    Mr. Esparza's knowledge about New Mexico water law does not seem particularly extensive or detailed.  For example, Mr. Esparza did not appear to be aware of the *Hanson v. Turner* decision discussed below.

*Kelly Cassels*

54.    Kelly M. Cassels, a New Mexico attorney, testified as an expert in water law. The Court finds that Mr. Cassels is very knowledgeable and credible.  Mr. Cassels testified that in his opinion Debtor's inchoate water rights were of little or no value because of, inter alia, the decision in *Hanson v. Turney,* 136 N.M. 1, 94 P.3d 1 (Ct. App. 2004).  *Hanson* affirmed the OSE's decision not to allow a requested change of use of inchoate water rights, ruling that an inchoate water right is not really a water right at all, but only a "necessary first step" in obtaining a water right.  136 N.M. at 3.  Based on *Hanson*, Mr. Cassels was of the opinion that a third party buyer of Debtor's inchoate water rights would not be allowed to change the point of diversion, place of use, or purpose of use, rendering them essentially worthless.  In Mr. Cassels' opinion, Debtor's inchoate water rights will never have value unless they are put to beneficial use first and become "perfected" rights.

55.    Mr. Cassels cited three other reasons why he questioned the value of Debtor's inchoate water rights:  (i) Debtor will be required in the near (albeit indefinite) future to file a Proof of Application of Water to Beneficial Use, the result of which likely would be that any unused inchoate water rights would be lost; (ii) the lower Rio Grande basin is the subject of a pending adjudication, and when Debtor's water rights are adjudicated (again, the date is unknown; it could be any day, or years from now), inchoate water rights would be lost; and (iii)

the pending litigation between Texas and New Mexico over Rio Grande water rights puts additional pressure on all water rights claims in the lower Rio Grande basin.

56.    In a related matter, Mr. Cassels pointed out that the Guidelines adopted by the Mesilla Valley Administrative Area (the OSE division in charge of water rights in Debtor's area) require proof that beneficial use of water rights has been "continuous" before the OSE can declare that claimed water rights have been properly perfected.[12]    Because of the continuity requirement, Mr. Cassels did not think Debtor's apparent "outlier" diversion of 1317.03 AFY in 2007 could be used to obtain perfected water rights in that amount.

*Stephen C. Blanco*

57.    Mr. Blanco testified about the history of Debtor and the Picacho Hills subdivision, Debtor's difficulties with PRC and NMED, Debtor's relationship with its customers, Debtor's water and sewage quality issues, the Challenged Conveyances, and his plans for Debtor.

58.    The Court finds that Mr. Blanco's testimony about the history of the Picacho Hills development, and the Debtor, was credible and helpful.  It is clear that Blanco cares a lot about the Picacho Hills subdivision and Debtor, and has spent many years operating Debtor and developing the subdivision.

59.    Mr. Blanco's testimony about his and Debtor's relationship with NMED and PRC was helpful to the Court in understanding how the relationship evolved over time and came to be so adversarial.  Mr. Blanco gave only his "side of the story," but was generally credible from that perspective.

60.    On the other hand, the Court finds that Mr. Blanco's testimony about the Challenged Conveyances was not credible.   Mr. Blanco testified that he signed and/or

---

[12]    Mesilla Valley Administrative Area Guidelines for Review of Water Rights Applications, p. 13 (January, 1999).

acknowledged the Challenged Conveyances based on the advice of Messrs. Chisholm and Esparza, with no agreement or understanding of what he or Debtor would receive in exchange. This testimony strains the credulity of the Court. Mr. Blanco is a reasonably sophisticated businessman. To the extent he believed the (purportedly) transferred water rights had any value (which he now asserts), Mr. Blanco would have insisted on reasonable, agreed-upon consideration. Businesspeople to not transfer assets they think are worth $3,700,000 to unknown third parties without getting paid and agreeing on specific terms of exchange. The Court believes it much more likely that Mr. Blanco completed the Challenged Conveyances in an effort to delay the Receiver's proposed sale to MDWCA, rather than a bona fide effort to sell inchoate water rights for fair value. Further, it is clear Mr. Blanco knew he should not purport to convey the Receiver's assets, but he did so anyway.

61.    To Mr. Blanco's credit, he admitted that, given the current regulatory environment and financial situation, a reorganization of Debtor is not realistically possible, and that Debtor's assets must be sold.

*Other Findings*

62.    Given the Court's rulings on the Motion, the Court does not believe it appropriate to make a finding whether the proposed sale to MDWCA is fair and reasonable. However, the Court finds that the evidence supporting Receiver's position on the sale clearly is sufficient to submit the matter to the state court for a hearing and ruling.

63.    A substantial delay could jeopardize the sale to MDWCA. The risk that MDWCA would terminate the pending purchase agreement is unknown, but the Court finds that if the sale does not close by June 30, 2013, there is a risk the acquisition would less attractive to MDWCA and/or NMED, because there would be a one-year delay in building the Discharge

Pipeline, and/or a substantial increase in the cost of borrowed funds.

64.     There is a risk to public health caused by Debtor's current operations, which would be alleviated if Debtor's assets were promptly sold to MDWCA and MDWCA completed the Discharge Pipeline.  The size of the risk is unknown, and probably is not too significant, given that NMED has taken no action and the risk has been present since Debtor began operating.  Nevertheless, the Court finds that the sooner Debtor's assets are sold to a well-capitalized buyer that can and will build the Discharge Pipeline, the better for public health.

65.     It appears Debtor's assets may bring enough at sale to pay creditors in full, so the interests of equity should be taken into account.

## II.     MOTION TO EXCUSE TURNOVER

A.     Law on § 543(d).

In determining whether a custodian[13] of property of the debtor should be excused from turnover, courts have reviewed the following:

(1)     The likelihood of reorganization, and whether funds held by the receiver are required for reorganization;[14]

(2)     Whether the debtor mismanaged the property;

(3)     Whether turnover would injure the creditors;

(4)     Whether the debtor would use the property for the creditors' benefit;

(5)     Whether there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

(6)     The fact that the automatic stay has deactivated the state court Receiver Action.[15]

The party requesting excusal from turnover must show by a preponderance of evidence

---

[13]  A receiver appointed by a state court is a "custodian" subject to § 543(b).  *See* 11 U.S.C. § 101(11); *In re Franklin,* 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012).

[14]  An alternative statement of this factor is "the likelihood of a reorganization, and the probability that funds required for reorganization will be available."  *In re Northgate Terrace Apts., Ltd.,* 117 B.R. 328, 332 (Bankr. S.D. Ohio 1990).

[15]  *See In re Attack Properties, LLC,* 478 B.R. 337 (N.D. Ill. 2012), citing *In re Franklin,* 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012); *Dill v. Dime Bank (In re Dill)*, 163 B.R. 221, 225 (E.D.N.Y. 1994).

that the best interests of the creditors are served by permitting a custodian to retain control of the estate. *Franklin,* 476 B.R. at 551, citing *In re Falconridge, LLC,* 2007 WL 3332769 at *6–7 (Bankr. N.D. Ill. 2007). If such a showing is made, the burden shifts to the debtor to show why turnover is appropriate. *In re Plihal,* 97 B.R. 561, 564 (Bankr. D. Neb. 1989).

The "paramount and sole concern is the interests of *all* creditors." *Falconridge*, 2007 WL 3332769, at *7, citing *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 239 (Bankr. W.D. Mo. 1989) (emphasis in original). The interests of the debtor are not to be considered. *Falconridge, at *7,* citing *Dill,* 163 B.R. at 225; *Foundry of Barrington P'ship v. Barrett (In re Foundry of Barrington P'ship)*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991).[16]

Whether the Court decides to apply § 543(d)(1) is based on the exercise of its discretion. *See In re R&G Properties, Inc.,* 2008 WL 4966774, at *4 (Bankr. D. Vt. 2008), citing *Dill,* 163 B.R. at 225; *Northgate Terrace Apts.,* 117 B.R. at 332.

B.    Discussion.

The Court weighs the *Attack Properties* factors as follows:

| Factor | Discussion/ Findings |
|---|---|
|  |  |
| 1.  Likelihood of reorganization; | Reorganization is very unlikely, given the strained relationship between Debtor and its regulators, and Debtor's lack of capital. Mr. Blanco admits that in all likelihood Debtor will have to sell rather than reorganize. Thus, the funds held and/or generated by the Receiver are not required for reorganization; |
| 2.  Whether the debtor mismanaged the property; | Per the PRC's Final Order, which binds Debtor and the Court, the Court finds that Debtor mismanaged its property and business before Receiver's appointment; |
| 3.  Whether turnover would injure the creditors; | Ordering turnover would prevent the Receiver from completing the pending sale, and it does not appear Debtor would pursue the sale. If the sales price is favorable, turnover would injure the creditors; |

---

[16] However, if the debtor is solvent, the interests of equity must be considered. 11 U.S.C. § 543(d)(1).

| 4. Whether the debtor would use the property for the creditors' benefit; | The Court has no reason to believe Debtor would use its property in a manner inconsistent with the rights of creditors, but Debtor may have unrealistic ideas about the value of its property (e.g. $3,752,000 for inchoate water rights), which would at a minimum result in delay, and could prejudice creditors; |
|---|---|
| 5. Whether there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; | There are no avoidance issues related to property held by Receiver that cannot, apparently, be dealt with by the state court.[17] Post-sale, Debtor can pursue any remaining avoidance actions in this Court; |
| 6. The fact that the automatic stay has deactivated the state court Receiver Action. | The automatic stay will be modified by the relief granted on the Motions, and therefore will not interfere with the Receiver Action. |

The Court finds that excusing turnover clearly is in the best interests of creditors. Since the estate may be solvent, the Court should consider the interests of equity also. 11 U.S.C. § 543(d)(1). Based on a preponderance of evidence, the Court finds that equity security holders (i.e. Mr. Blanco) would be better served by permitting the Receiver to remain in possession, custody, and control of Debtor's assets. The Motion to Excuse should be granted.

### III.    MOTION TO ABSTAIN

A.    Law on § 305(a)(1).

Abstention from hearing a bankruptcy case is authorized by § 305(a)(1), which provides:

The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if--
(1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

Abstention or suspension under § 305(a)(1) is an unusual remedy. *In re StatePark Building Group, Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004). *See also In re Starlite Houseboats, Inc.*, 426 B.R. 375, 388 (Bankr. D. Kan. 2010) (abstention appropriate in rare

---

[17] The Receiver testified he is confident he can set aside the Challenged Conveyances in state court. Doing so likely is a condition to closing the proposed sale to MDWCA. If the Receiver changes his position on this matter, he should notify the Court.

circumstances).  The burden of proof for a motion to abstain is on the party seeking abstention.

*In re Forest Hill Funeral Home & Memorial Park-East, LLC*, 364 B.R. 808, 819 (Bankr. E.D.

Okla. 2007), citing *In re Taylor Agency, Inc.*, 281 B.R. 354, 359 (Bankr. S.D. Ala. 2001).

There is no agreement on what "interests of creditors and the debtor" should be

considered.  In *In re Eastman,* 188 B.R. 621 (9th Cir. BAP 1995), the 9th Circuit BAP stated:

> As the statutory language and legislative history demonstrate, the test under §
> 305(a) is not whether dismissal would give rise to a substantial prejudice to the
> debtor.  Nor is the test whether a balancing process favors dismissal.  Rather, the
> test is whether both the debtor and the creditors would be "better served" by a
> dismissal.

188 B.R. at 625.  The discussion in *In re Spade*, 258 B.R. 221, 225 (Bankr. D. Colo.), *aff'd.*, 269

B.R. 225 (D. Colo. 2001), is helpful:

> The language enacted by Congress in § 305 is rather simple . . . .  It is true that
> certain elements of this provision are not specifically defined.  For example, the
> provision offers no guidance as to what "interests of the creditors and the debtor"
> might include, nor does it specify the situations in which these interests would be
> "better served" by dismissal or suspension.  Nevertheless, the rules of statutory
> construction prohibit a court from abandoning the plain language of § 305 unless
> it makes a determination that the statute is ambiguous.  *See id.*  Words or phrases
> that are not specifically defined in a statute are not ambiguous per se.  Congress
> routinely drafts provisions with broad language as a means of delegating
> discretion to those obligated to act under the provision.

*Id.* at 225.

Courts have come up with various lists of factors to consider when ruling on a §

305(a)(1) motion.  A recent decision used the following list:

> (1)     Economy and efficiency of administration;
> (2)     Whether another forum is available to protect the interests of both
> parties or there is already a pending proceeding in state court;
> (3)     Whether federal proceedings are necessary to reach a just and
> equitable solution;
> (4)     Whether there is an alternative means of achieving an equitable
> distribution of assets;
> (5)     Whether the debtor and the creditors are able to work out a less
> expensive out-of-court arrangement which better serves all interests in the case;

(6)     Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7)     The purpose for which bankruptcy jurisdiction is sought.

*In re Birchall*, 381 B.R. 13, 18 (Bankr. D. Mass. 2008), citing *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007) and *In re Fax Station, Inc.*, 118 B.R. 176 (Bankr. D.R.I. 1990).[18]

Courts agree, however, that each case must be decided by its own facts. *See In re Iowa Trust*, 135 B.R. 615, 622-23 (Bankr. N.D. Iowa 1992) ("although [various] tests are useful in determining whether dismissal under § 305(a) is appropriate, courts must look to the factors of the individual cases"), quoting *In re Trina Assoc.*, 128 B.R. 858, 867 (Bankr. E.D.N.Y. 1991).

Case law on abstention through suspension (rather than dismissal) is sparse. The most instructive case is *In re Mazzocone,* 183 B.R. 402 (Bankr. E.D. Pa. 1995), *aff'd,* 200 B.R. 568 (E.D. Pa. 1996), where Chief Judge Scholl suspended a voluntary Chapter 11 case for six months to allow the parties to litigate their numerous disputes in a pending state court action. In doing so the court stated: "Pursuant to 11 U.S.C. § 305(a) . . . we may exercise our discretion to temporarily relinquish jurisdiction over a case." 183 B.R. at 420. The court suspended all proceedings and ordered the parties to provide a written status report in six months, after which time the court would determine whether to dismiss the case, convert the case, or continue the suspension. *Id.* at 422. *See also In re Rookery Bay, Ltd.,* 190 B.R. 949, 951 (Bankr. M.D. Fla.

---

[18]     *See also* 2006 Norton's Annual Survey of Bankruptcy Law: Abstention: Recent Developments, text accompanying note 16 (citing the same factors). Other cases identify different factors to consider. *See, e.g., In re ABQ-MCB Joint Venture,* 153 B.R. 338 (Bankr. D.N.M. 1993) (listing 12 factors); *In re Colonial Ford,* 24 B.R. 1014, 1023 (Bankr. D. Utah 1982) (existence of comprehensive pre-bankruptcy workout agreement crucial factor in court's decision to abstain, so debtor does not get a chance to "reorganize" twice); *In re Wilson,* 85 B.R. 722, 727 (Bankr. E. D. Pa. 1988) (abstention may be warranted to permit a dispute to be heard by a specialized forum); *Forest Hill Funeral Home,* 364 B.R. at 824 (abstention may be appropriate when a state needs to enforce its police powers); *In re Iowa Trust,* 135 B.R. 615, 623 (Bankr. N.D. Iowa 1992) (degree of creditor support).

-17-

1995) (Chief Judge Paskay suspended "any further proceedings" an involuntary chapter 7 case until a pending state court appeal could be decided); *Colonial Ford,* 24 B.R. at 1023 (§305(a)(1) permits suspension as well as dismissal of a case).

B.    Discussion.

The Court weighs the following factors as follows:

| Factor | Discussion/Findings |
|---|---|
| | |
| 1. Economy and efficiency of administration; | Economy and efficiency would be better served by suspension, given the status of the Receiver Action; |
| 2. Whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; | The Receiver Action is pending, and the interests of the parties, including Debtor, can be protected there, at least until after the sale; |
| 3. Whether federal proceedings are necessary to reach a just and equitable solution; | Federal proceedings are not needed to allow Receiver to sell the receivership assets. It is less clear to the Court that Debtor's estate can be properly liquidated and distributed, post-sale, without use of the Bankruptcy Code, and in any event Debtor is entitled to the benefit of the Bankruptcy Code if desired; |
| 4. Whether there is an alternative means of achieving an equitable distribution of assets; | This Court is, on balance, a better place to liquidate and distribute Debtor's assets, post-sale. Pre-sale, the Receiver Action is a perfectly acceptable alternative forum to supervise the sale of Debtor's assets; |
| 5. Whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; | Per the Settlement Agreement and Stipulated Partial Judgment, the parties agreed to an out-of-(bankruptcy) court) arrangement, and the arrangement should be honored. A key provision of the agreement was that the Receiver would be allowed to sell Debtor's assets, subject to state court approval. Allowing the Receiver to pursue the sale of Debtor's assets would be less expensive and serve the interests of the parties better; |
| 6. Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; | Following through with the Settlement Agreement and Stipulated Partial Judgment, the state court can promptly rule on the Receiver's pending motion to approve the sale. It would be improper for this Court to shift the sale venue from the Receiver Action, given all of the facts of the case; |
| 7. The purpose for which bankruptcy jurisdiction is sought; | Debtor's motives are mixed. Debtor wants to take control of the sales process, which the Court finds would not be in the best interests of any party, and contrary to the |

-18-

| | Settlement Agreement and Stipulated Partial Judgment. On the other hand, Debtor also wants bankruptcy court law and procedure in the final liquidation of its estate, post-sale, which the Court finds is fair and reasonable, and consistent with the Settlement Agreement; |
| --- | --- |
| 8. Whether § 305(a)(1) relief has the substantial support of creditors; | All creditors that have taken a position in this matter support Receiver's request for § 305(a)(1) relief. The only opposition is from Debtor; |
| 9. Whether § 305(a)(1) relief is appropriate to allow a state to enforce police powers. | It is unclear whether the automatic stay prevents PRC from pursuing the Receiver Action.[19] Nevertheless, the relief granted by the Court will allow the Receiver to pursue his proposed sale in state court, which is consistent with PRC's and NMED's police powers. |

Considering all of the facts of the matter, the Court concludes that the interests of creditors and Debtor would be better served by suspending this case until after the Receiver has completed the sale of Debtor's assets. Among other reasons, suspension follows the logic of *Colonial Ford* and requires the parties to complete the arrangement worked out and memorialized in the Settlement Agreement and Stipulated Partial Judgment. The Court does not believe it would be right for Debtor to use bankruptcy court jurisdiction to renege on the Settlement Agreement, especially since allowing the Receiver to sell assets in the Receiver Action has unanimous creditor support.[20] Furthermore, since Debtor acknowledges that its assets

---

[19] Compare *In re Yellow Cab Co-op. v. Metro Taxi, Inc.,* 132 F.3d 591 (10th Cir. 1997) (using the "pecuniary purpose" and the "public policy" tests to determine whether the stay applies), with *In re Cash Currency Exchange, Inc.,* 762 F.2d 542, 555 (7th Cir. 1985) (quoting *State of Missouri v. United States Bankruptcy Court,* 647 F.2d 768, 776 (8th Cir. 1981), *cert. denied,* 454 U.S. 1162 (1982), the Seventh Circuit held that the police powers exception set forth in 11 U.S.C. § 362(b)(4) has been narrowly construed to apply to the enforcement of state laws affecting health, welfare, morals and safety, but not to "regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court"). The Court finds that PRC's desire for a receiver to operate and sell Debtor's assets is not motivated by pecuniary interest, but by public policy concerns. On the other hand, allowing PRC to pursue its state law receiver rights would directly conflict with the Court's control of *all* estate property. The Tenth Circuit might find this regulatory reach too much to allow under § 362(b)(4), even if the "public policy" test is satisfied. Given the Court's ruling on the Motions, however, the Court does not have to decide the issue.

[20] *See also In re Club Tower, L.P.,* 138 B.R. 307 (Bankr. N.D. Ga. 1991) (pre-petition forbearance agreements that give a creditor relief from the automatic stay if the debtor subsequently files bankruptcy are enforceable), citing *In re Citadel Properties, Inc.,* 86 B.R. 275 (Bankr. M.D. Fla. 1988); *In re Orange Park South P'ship,* 79 B.R. 79 (Bankr. M.D. Fla. 1987); *In re Deb-Lyn, Inc.,* 2004 WL 452560, at *1 (N.D. Fla. 2004) (same); *In re Hudson Manor Partners, Ltd.,* 1991 WL 472592, at *1 (Bankr. N.D. Ga.

must be sold, there is no reason why this Court, rather than the state court, should supervise the sale. If as Debtor contends the sales price is inadequate, that showing can be made to the state court, which has to rule on the reasonableness of the sales price and other terms.

After completion of the Receiver's sale of assets, the Court finds that allowing Debtor to complete the liquidation of its estate in this case would not deprive BRG or PRC of any bargained-for benefits, and would allow Debtor to exercise its right to use the federal bankruptcy process.

Suspension under § 305(a)(1) divests the Court of jurisdiction over the case for the suspension period. *In re Mazzocone,* 183 B.R. at 420. Because of that, the Bankruptcy Code and Rules will not apply during the suspension period. To the extent there is any doubt about the matter,[21] however, the Court will exercise its powers under § 105(a) and grant relief, during the suspension period, from all Code sections and Rules, so the parties may have unfettered freedom to pursue (or object to, as the case may be) any assets sales proposed by the Receiver.

IV. THE MOTION TO DISMISS

A. Law on § 1112(b) Motions to Dismiss for Bad Faith Filing.

Dismissal of a Chapter 11 bankruptcy case is governed by 11 U.S.C. § 1112(b).[22] The Court generally is required to dismiss or convert a case under this section upon a finding of "cause."

---

1991) (same).

[21] *See e.g. In re Compania de Alimentos Fargo*, 376 B.R. 427, 440 (Bankr. S.D.N.Y. 2007) (in dicta, Judge Bernstein implied that § 305(a) suspension may not terminate the automatic stay); *In re Duratech Indus., Inc.,* 241 B.R. 291 (Bankr. E.D.N.Y. 1999) (court apparently believed U.S. Trustee guidelines applied during the suspension period).

[22] *See* 11 U.S .C. § 1112(b)(1) ("on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate ...").

-20-

Section 1112(b)(4) contains a nonexclusive list of "causes."[23]  Whether "cause" exists to dismiss or convert a Chapter 11 case is a threshold issue.  *In re Melendez Concrete Inc.,* 2009 WL 2997920, at *3 (Bankr. D.N.M. 2009).

A debtor's bad faith in filing a petition can constitute "cause" for dismissal under 11 U.S.C. § 1112(b).  *See In re First Assured Warranty Corp.,* 383 B.R. 502, 543 (Bankr. D. Colo. 2008) (citing *In re Frieouf,* 938 F.2d 1099, 1105 (10th Cir. 1991), the court stated that "[a]lthough a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal.").[24]

In determining whether a Chapter 11 petition was filed in bad faith, courts have identified the following non-exclusive factors to consider:

> (1)     whether the petition serves a valid bankruptcy purpose such as preserving a going concern or maximizing the value of the debtor's estate;
> (2)     whether the petition is filed merely to obtain a tactical litigation advantage;
> (3)     whether the debtor's financial problems involve essentially a dispute between the debtor and secured creditors that can be resolved in the pending state court litigation;
> (4)     whether it is a single asset case,
> (5)     whether there are one or a very few unsecured creditors,
> (6)     whether there is no ongoing business or employees;
> (7)     whether the pre-petition conduct of the debtor was improper; and
> (8)     whether the case is filed to evade one or more court orders.[25]

---

[23]   *AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.),* 360 B.R. 398, 401 (Bankr. D.N.H. 2007) (the § 1112(b)(4) list is not exhaustive); *In re Whetten,* 473 B.R. 380, 382 (Bankr. D. Colo. 2012) (same).

[24]   *See also In re Lee,* 467 B.R. 906, 917 (6th Cir. BAP 2012) (well-settled in Sixth Circuit that a debtor's bad faith in filing a chapter 11 may be cause for § 1112(b)(1) dismissal); *AmeriCERT,* 360 B.R. at 401 ("a case may be dismissed for other causes, such as bad faith"); *In re Pacific Rim Investments, LLP,* 243 B.R. 768, 771 (D. Colo. 2000) (citing *Udall v. FDIC (In re Nursery Land Dev. Inc.),* 91 F.3d 1414 (10th Cir. 1996), the court held that a "Chapter 11 petition must be filed in good faith, and if not, dismissal of the case is an appropriate remedy").

[25]   *See In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 122 (3rd Cir. 2004) (applying one or more of the factors); *In re Nursery Land Development, Inc.,* 91 F.3d 1414, 1416 (10th Cir. 1996) (same); *Trident Associates Ltd. v. Metropolitan Life Ins. Co. (In re Trident Associates Ltd.),* 52 F.3d 127, 130 (6th Cir. 1995), *cert denied,* 516 U.S. 869 (1995) (same); *Phoenix Piccadilly Ltd. v. Life Ins. Co. of Virginia (In re*

No single factor is determinative, and the weight given to each will vary with the facts and circumstances of the case.[26] Whether a bankruptcy petition was filed in bad faith "requires the court to consider the totality of circumstances and any conceivable list of factors is not exhaustive nor does one factor create a *per se* test." *In re Sydnor,* 431 B.R. 584, 594 (Bankr. D. Md. 2010) (citation omitted).[27]

The party requesting dismissal or conversion of a Chapter 11 case under 11 U.S.C. § 1112(b) bears the burden of establishing cause by a preponderance of the evidence. *In re ARS Analytical, LLC,* 433 B.R. 848, 861 (Bankr. D.N.M. 2010).[28]

Whether dismissal for bad faith is warranted falls within the Court's sound discretion. *See Squires Motel, LLC v. Gance,* 426 B.R. 29, 34 (N.D.N.Y. 2010) (citing *In re First Conn. Consulting Group, Inc.,* 254 Fed. Appx. 64, 68 (2d Cir. 2007), the court held that "a dismissal for bad faith ... involves a bankruptcy court's exercise of equitable discretion").

B.    Discussion.

The Court finds, based on the evidence presented at the final hearing and the findings in PRC's Final Order, that Debtor did not file the petition in good faith to the extent it hoped thereby to avoid its obligations under the Settlement Agreement and Stipulated Partial Judgment. On the other hand, the Court finds that Debtor filed the petition in good faith when it sought to use the Bankruptcy Code's distribution scheme and laws, post-sale. The Court's finding is based on the following considerations:

---

*Phoenix Piccadilly, Ltd.),* 849 F.2d 1393, 1394 (11th Cir. 1988) (same).

[26] *Melendez Concrete,* 2009 WL 2997920 at *4 (citing *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir. 1983)).

[27] *See also In re Marshall,* 298 B.R. 670, 681 (Bankr. C.D. Cal. 2003) (analysis of debtor's alleged bad faith is based on the totality of the circumstances).

[28] *See also Lee,* 467 B.R. at 917 ("The party seeking dismissal of a case under § 1112(b) must demonstrate a debtor's bad faith by a preponderance of the evidence.") (citing *Alt v. United States (In re Alt),* 305 F.3d 413, 420 (6th Cir. 2002).

| Factor | Discussion |
|---|---|
| | |
| 1. Valid bankruptcy purpose? | Post-sale, the case will serve a valid bankruptcy purpose, namely the liquidation of Debtor's bankruptcy estate. Pre-sale, the case would serve an invalid purpose of evading the Settlement Agreement and Stipulated Partial Judgment; |
| 2. Filed to obtain tactical litigation advantage? | One of Debtor's main purposes in filing the case was to regain control over the process of selling Debtor's assets. To that extent, the case was filed to obtain a tactical litigation advantage; |
| 3. Dispute between the debtor and secured creditors that can be resolved in the pending state court litigation? | The main dispute can be resolved in the Receiver Action. Thereafter, Debtor can finalize the liquidation and distribution of its estate in this Court; |
| 4. Single asset case? | This is not a single asset case; |
| 5. Number of unsecured creditors? | There appear to be about 16-20 unsecured creditors; |
| 6. Ongoing business or employees? | Debtor has ongoing businesses, and has employees; |
| 7. Pre-petition conduct of the debtor improper? | Per the PRC findings, which are binding on Debtor and the Court, Debtor's pre-petition conduct was improper; |
| 8. Case filed to evade one or more court orders? | In part, the case was filed to avoid the Settlement Agreement and Stipulated Partial Judgment. However, the case also was filed to finalize liquidation of assets and payment of net dividend to creditors and/or equity, using the Bankruptcy Code. |

If the Court's only choices were to dismiss the case or allow Debtor back into possession of its assets, with the sole right to operate and sell them, the Court likely would either find "cause" for dismissal under § 1112(b)(1), or else would abstain and dismiss under § 305(a)(1). However, given the Court's ruling on the Motion to Excuse Turnover and the Motion to Abstain, together with the finding that Debtor has a good faith basis to use the Bankruptcy Code to finalize the liquidation and distribution of its estate, post-sale, the Court concludes that the case was not filed in bad faith.

## V.    CONCLUSION

Given Debtor's current financial condition and relationship with its regulators; the status of the Receiver Action; Debtor's commitments under the Settlement Agreement and Stipulated

Partial Judgment; and the other facts discussed above, the Court concludes that it should excuse the Receiver's turnover of estate assets and suspend the case under § 305(a)(1) until the Receiver has sold the assets. The Court will not dismiss the case, however, and will reactivate it after a Receiver sale has been finalized. A separate order will be entered.

_____
Honorable David T. Thuma
United States Bankruptcy Judge

Date entered on docket: April 26, 2013.

Copies to:

Paul M Fish
P.O. Box 2168
Albuquerque, NM 87103-2168

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Benjamin Silva, Jr.
Silva & Gonzales, P.C.
P.O. Box 100
Albuquerque, NM 87103

Tommy O'Shea Gilstrap, Jr.
Gilstrap & Associates, P.C.
5915 Silver Springs Bldg. 2
El Paso, TX 79912

James W. Brewer
P.O. Box 2800
El Paso, TX 79999-2800

Michael Smith
NM Public Regulation Commission
P.O. Box 1269
Santa Fe, NM  87504-1269

Kelly P. Albers
Law Office of Kelley P. Albers, PC
650 Montana Ave, Ste. D
Las Cruces, M 88001-4294

Carol Mary Parker
NM Environment Department
1190 S. St Francis Dr., Ste. N-4067
Santa Fe, NM 87501

Leonard Martinez-Metzgar
P.O. Box 608
Albuquerque, NM 87103