UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

PICACHO HILLS UTILITY COMPANY, INC.,                    Case No. 13-10742-tl7

    Debtor.

## MEMORANDUM OPINION

Before the Court is the Chapter 7 Trustee's motion to approve a settlement reached with the Debtor's former bankruptcy counsel, resolving the Trustee's objection to the counsel's final fee application. The Debtor and its sole shareholder, Stephan Blanco ("Blanco"), objected to the settlement, arguing that the estate has substantial malpractice claims against the former counsel, the value of which is not sufficiently reflected in the settlement. The Trustee countered that Debtor and Blanco lack standing to object, and also that the alleged malpractice claims have very little or no value. For the reasons set forth below the Court rules that Debtor and Blanco have standing, but that the settlement is reasonable.

                      I.        FACTS

The Court finds[1] the following facts:[2]

The Debtor operated a public utility that supplied water and sewer services to customers near Las Cruces, New Mexico. Its main assets were about 1.5 acres of real property; water wells

---

[1] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

[2] In making these findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir.1979) (holding that a court may, sua sponte, take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir.1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket"); *In re Quade*, 496 B.R. 520, 524 (Bankr.N.D.Ill.2013), *affirmed*, 498 B.R. 852 (N.D. Ill. 2013) (a "bankruptcy court [is authorized] ... to take judicial notice of its own docket").

and pumps; distribution lines; a wastewater treatment facility; storage tanks; and 2260 acre feet per year ("AFY") of permitted water rights. About 384 AFY of the water rights have been put to beneficial use; the remaining 1876 AFY are "inchoate."[3]

Debtor and Blanco ran afoul of the New Mexico Public Regulation Commission ("PRC"), resulting in the imposition of substantial penalties. Further, the PRC intervened in a pending state court foreclosure action, captioned *Bank of Rio Grande v. Picacho Hills Utility Company, Inc., et al.,* Cause No. D-307-CV-201002416 (the "State Court Action"), and joined in plaintiff's motion to appoint a receiver for Debtor's assets. On November 14, 2011, the presiding judge, Hon. James T. Martin, entered an order appointing Robert Martin (no relation) as the receiver ("Receiver").

On July 16, 2012, after a lengthy mediation, Blanco, Debtor, Bank of the Rio Grande, and PRC signed a Settlement Agreement. As part of the Settlement Agreement, Blanco and Debtor "agree[d] to the sale of the Picacho Hills Utility Co (PHUC) assets by the receiver."

On August 31, 2012, Judge Martin entered a Stipulated Partial Judgment that stated, inter alia: "PHUC and Blanco agree to the sale of PHUC assets by the Court appointed Receiver, Robert Martin and/or his successors or assigns."

At about the time the Settlement Agreement was signed, the Receiver asked Debtor's counsel (Alex Chisholm) whether Debtor would look favorably on a sale of the utility assets for $2,000,000. Mr. Chisholm stated Debtor would be delighted with such a price.

The Receiver found a potential buyer, the Doña Ana Mutual Domestic Water Consumers

---

[3] There is some evidence that 1317 AFY of water rights, or even 1617 AFY, have been put to beneficial use and therefore are "perfected," rather than just 384 AFY. These higher amounts are based upon an alleged diversion in 2007. There is no direct evidence of the diversion, however, and the Office of the State Engineer has never acknowledged that Debtor owns more than 384 AFT of perfected water right. The Debtor's expert witness, Dr. Turner, testified that Debtor's perfected water rights are limited to the 384 AFY.

Association ("Doña Ana Water"). On September 4, 2012, the Receiver filed a "Motion for Approval of Agreement of Purchase and Sale of Assets and for Approval of Receiver's Fees and Costs" (the "Sale Motion"), seeking state court approval of the proposed sale to Doña Ana Water. The proposed sale price was $2,250,000.

Debtor and Blanco, acting through their counsel Alex Chisholm, objected to the Sale Motion on September 21, 2012, arguing that the price was inadequate.

On August 31, 2012, unbeknownst to the Receiver, Blanco caused Debtor to convey 1,876 AFY of inchoate water rights to Rio Grande Investments, LLC.[4] On September 19, 2012, Blanco caused Rio Grande Investments, LLC to convey the same water rights to Resurrection Mining, LLC, an entity 22% owned by Blanco.[5]

On November 27, 2012, the Receiver filed a Motion For Order to Show Cause Why Parties Should Not be Held in Contempt and to Void Transfers of Receivership Assets (the "Contempt Motion").

Hearings on the Sale Motion and the Contempt Motion were originally set for January 8, 2013, but were continued to March 11, 2013. On March 7, 2013, Debtor filed this bankruptcy case. Debtor admitted it filed the case primarily "to stop a sale of the assets of Debtor for less than adequate consideration."

On the petition date the Debtor filed an application to retain William F. Davis & Associates, P.C. (the "Davis Firm") as bankruptcy counsel. The Court granted the application on April 3, 2013, effective as of the petition date. The Davis Firm represented the Debtor in the case from the petition date until it withdrew on January 29, 2015.

---

[4] Apparently no such entity had been formed, at least in New Mexico.
[5] The purported conveyances were via two quitclaim deeds and two Change of Ownership forms, prepared at Blanco's instruction and signed by Blanco. The deeds were recorded in Dona Ana County, but the Office of the State Engineer refused to accept the Change of Ownership forms.

The Receiver filed motions in the bankruptcy case to be excused from turning over Debtor's property to the bankruptcy estate, and for the Court to abstain from hearing the case so Judge Martin could rule on the Sale Motion and oversee completion of the sale. After a lengthy evidentiary hearing, on April 26, 2013, the Court entered orders excusing turnover and abstaining until the state court receivership sale had been completed. The Court also ordered that any net sale proceeds be placed in the Court's registry.

On May 10, 2013, the Davis Firm entered an appearance in the State Court Action and filed a motion to intervene on behalf of "the bankruptcy estate of Picacho Hills Utility Company, Inc."

Judge Martin held a hearing on May 13, 2013 on the Davis Firm's motion to intervene, the Contempt Motion, and the Sale Motion. At the hearing, Blanco and the Debtor were represented by Alex Chisholm.

After hearing arguments of counsel, Judge Martin granted the motion to intervene "for the limited purpose of representing the bankruptcy estate in [the motion to approve sale] proceeding."

Judge Martin next addressed the Contempt Motion. In defending the purported conveyance of inchoate water rights, Mr. Chisholm argued that the water rights were not part of the utility company, were not in the utility's "rate base," and therefore were available for conveyance despite the receivership. Judge Martin expressed skepticism about this argument, and got Mr. Chisholm to concede that any buyer of the utility would need some portion of the inchoate water rights for future growth and development. After admitting this was so, Chisholm agreed that his clients would re-convey the inchoate water rights to the Receiver. Independently, Judge Martin ruled that the purported conveyances were void.

Finally, Judge Martin took up the Sale Motion. Mr. Chisholm, on behalf of the Debtor and Blanco, was the only person to argue against the Sale Motion. Mr. Chisholm asserted that the $2,250,000 purchase price was reasonable if only 384 AFY of water rights were being sold, but that if the inchoate water rights were part of the deal, the purchase price should be $3,000,000. Judge Martin asked Mr. Chisholm if he wanted to call any witnesses in support of the Debtor's and Blanco's objection. At Mr. Chisholm's request, Judge Martin called a short recess so Mr. Chisholm could contact potential witnesses.

When court reconvened, Mr. Chisholm informed Judge Martin that Debtor and Blanco had agreed to an order granting the Sale Motion. Mr. Chisholm waived his clients' right to call witnesses, introduce documents, or argue in opposition to the sale. Mr. Chisholm stated on the record that both Blanco and the Debtor approved the sale order.

Judge Martin asked Mr. Chisholm if his clients contemplated any appeal from the sale order. Mr. Chisholm replied: "No sir, Your Honor. Mr. Blanco, I talked to him on the phone. He's agreed to it. We agreed to the terms of the order."

Despite the events just described, the Debtor and Blanco now contend that the utility assets were sold for much less than their actual worth. Their expert, Dr. Turner, opined that the water rights were worth between $5.6 and $8 Million.[6] Debtor and Blanco complain that the Davis Firm did not object to the sale, undertake independent investigation of the value of the

---

[6] The Court is not persuaded that the Debtor's water rights were worth as much as the Debtor and Blanco's expert contends. First, his valuation is based on the assumption that the Debtor owns 1617 AFY of perfected water rights. There is substantial dispute about that. The number more likely is 384 AFY. Second, Dr. Turner states in his written opinion: "We believe the value for the inchoate water rights may be more than that of the perfected water rights. . . ." This statement cannot be taken seriously, and hurts Dr. Turner's credibility in other areas. Further, Dr. Turner's written opinion is inconsistent with his trial testimony about the number of perfected AFY of water rights Debtor owns (1617 AFY versus 384 AFY). If, as seems highly likely, the inchoate water rights are worth much less than the perfected rights, and if $3,000 per AFY is a reasonable value, then the $2,150,000 purchase price appears reasonable.

-5-

assets, or mount any evidentiary opposition. This failure, they argue, constituted malpractice and cost the Debtor millions of dollars.

On October 15, 2014, the Davis Firm filed its final fee application, asking for approval of $175,618.13 as a Chapter 11 administrative expense. This amount includes $63,680.12 the Court approved on the Davis Firm's previously filed fee application. The Trustee and others objected. The Trustee and the Davis Firm resolved the objection; under the proposed settlement the Davis Firm's approved fees would be only $99,527.13, a reduction of $76,091. The Davis Firm also agreed to potential disgorgement if the estate turned out to be administratively insolvent. The proposed settlement included settlement of any estate malpractice claims against the Davis Firm or William F. Davis. Only the Debtor and Blanco, through new counsel, objected to the proposed settlement.

## II. DISCUSSION

### A. Standing.

As an initial matter, the Trustee and the Davis Firm contend that Debtor and Blanco lack standing to object to the proposed settlement. "To have standing, a debtor must have a financial interest in the proposed settlement." *In re Brutsche*, 500 B.R. 62, 71 (Bankr. D.N.M 2013). *See also Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.)*, 151 F.3d 605, 607 (7th Cir. 1998) ("Bankruptcy standing is narrower than Article III standing. To have standing to object . . ., a person must have a pecuniary interest in the outcome of the bankruptcy proceedings"); *Stinnett v. Laplante (In re Stinnett)*, 465 F.3d 309, 315 (7th Cir. 2006) (citing *In re Cult Awareness Network*); *Lunan v. Jones (In re Lunan)*, 523 Fed. Appx. 339, 340 (6th Cir. 2006) (to the same effect).

To meet the standing requirement, "the debtor must show a reasonable possibility of

surplus after satisfying all debts." *In re Brutsche*, 500 B.R. at 72. "[T]he debtor cannot simply claim that there is a theoretical chance of a surplus in the estate, but must show that such surplus is a reasonable possibility." *In re Lunan*, 523 Fed. Appx. at 340 (quoting *Simon v. Amir (In re Amir)*, 436 B.R. 1, 10 (6th Cir. BAP 2010). It is rare that a chapter 7 debtor will have a pecuniary interest in a motion to approve settlement as oftentimes "no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." *In re Cult Awareness Network, Inc.*, 151 F.3d at 607. *See also In re Morreale*, Case No. 13-27310 TBM 2015 WL 3897796 at *8 (Bankr. D. Colo. 2015) (citing *In re Cult Awareness Network, Inc.*).

Filed claims in the case are $1,875,079.97. Adding proposed administrative expenses, the liabilities of the estate could exceed $2 million. The current value of estate assets (other than the malpractice claim) is less than $1 million. To have standing, Debtor and Blanco must demonstrate a reasonable possibility that the alleged malpractice claim against the Davis Firm would net more than $1 million.

Debtor and Blanco argue that the water rights sold to Doña Ana Water were worth much more than the purchase price. To support this position, Debtor and Blanco put on expert testimony that the water rights were worth between $5.6 and $8 million. As the water rights and other utility assets were sold for $2.15 million, the theoretical recovery on a malpractice claim could be enough to create a surplus after all debts are satisfied. The Court therefore concludes that Debtor and Blanco have standing to object to the Motion.[7]

    B.    <u>Reasonableness of the Proposed Settlement</u>.

        1.    <u>Rule 9019(a)</u>. Federal Rule of Bankruptcy Procedure 9019(a) "allows a

---

[7] It is possible, of course, for a debtor prove standing by demonstrating the existence of potential claims, while failing to show that a proposed settlement of those claims is unreasonable. *In re Brutsche*, 500 B.R. at 72.

-7-

court, after notice and a hearing, to approve a compromise or settlement of a claim belonging to the bankruptcy estate, including a debtor's cause of action against a third party." *In re Brutsche*, 500 B.R. at 70. "Compromises are favored in bankruptcy." 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993). "The purpose behind compromises 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 255 (10th Cir. BAP 2006) (quoting *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1380–81 (9th Cir. 1986)).

The party seeking approval of a compromise bears the burden of showing "that the proposed settlement is fair, equitable, and in the best interests of the estate." *In re Brutsche*, 500 B.R. at 70. A court's decision to approve a compromise "must be an informed one based upon an objective evaluation of developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989). However, the Court need not engage in a mini-trial addressing the merits of the proposed compromise. *See Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*, 382 F.3d 68, 71–72 (1st Cir. 2004) (the responsibility of the bankruptcy judge is to canvass the issues and see whether the settlement is within the range of reasonableness). Further, "the proposed settlement does not need to represent the best possible outcome. . . . 'the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness.'" *In re Brutsche*, 500 B.R. at 70–71 (quoting *Tri-State Fin., LLC v. Lovald*, 525 F3d 649, 654 (8th Cir. 2008)). *See also Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 51 (1st Cir. 1998); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F2d 599, 608 (2nd Cir. 1983).

   2. <u>Settlement of Malpractice Claims</u>.  While this contested matter relates to the Davis Firm's fee application, the heart of the dispute is the value of estate's alleged malpractice claims against the Davis Firm. That is because the New Mexico Supreme Court

held, in *Potter v. Pierce*, 342 P.3d 54 (2015), that approval of an attorney fee application by a bankruptcy court could preclude on *res judicata* grounds a later malpractice action against the attorney. The *Potter* court concluded that a bankruptcy court hearing on allowance of fees was closely enough connected with a malpractice action to justify use of *res judicata* principles:

> We hold here that . . . [use of *res judicata* principles] extends to claims of malpractice after a bankruptcy fee proceeding concerning the same legal services. Petitioner's two claims are rooted in a common nucleus of operative facts. The claim for legal malpractice concerns the same service period and alleged deficiencies in the same legal services that were the subject of the bankruptcy fee proceeding. Petitioner's claims would have formed a convenient trial unit because the bankruptcy court is already required to consider the quality of these services in determining the appropriate fees and has procedures available to hear objections and institute an adversarial proceeding if necessary. . . . Treatment as a single unit would also conform to the parties' expectations because objections to services rendered must be raised in response to fee applications . . . and because Petitioner did raise malpractice allegations in his objections to Respondents' fees. For claim preclusion purposes, Petitioner's malpractice claim constitutes the same cause of action as the earlier fee proceeding in bankruptcy court.

342 P.3d at 58-59. The court affirmed the dismissal of all malpractice claims brought by Mr. Potter against his former bankruptcy counsel. While the Supreme Court noted that *res judicata* would not necessarily apply in every case, a bankruptcy court order approving fees will preclude a malpractice claim "if the facts demonstrate that it could and should have been brought during the earlier proceeding." *Id.* at 59. Here, the malpractice claim was raised and the Court conducted a one-day trial on the issue. *Res judicata* will apply in this case.

        3.     The <u>*Kopexa* Factors</u>. In approving a compromise under Rule 9019(a), a court must consider "(1) the probable success of the underlying litigation on the merits, (2) the possible difficulty in collection of a judgment, (3) the complexity and expense of the litigation, and (4) the interests of creditors in deference to their reasonable views." *Kopp v. All Am. Life Ins. Co., (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997) (citations omitted). *See also Allen v. Loveridge (In re Log Furniture, Inc.)*, 257 Fed. Appx. 101,

103 (10th Cir. 2007) (citing *In re Kopexa*). The Court will apply the *Kopexa* factors to the settlement of the alleged malpractice claims against the Davis Firm.

        a.    <u>Probability of Success</u>. The alleged malpractice claim has a number of substantial problems. To obtain a large net recovery from the Davis Firm, the Trustee would have to:

- Find a good plaintiff malpractice attorney, get his or her employment approved, and arrange for payment, likely by the hour;
- Find a good expert witness attorney who would be willing to testify that the Davis Firm committed malpractice, get his or her employment approved, and arrange for payment by the hour;
- Find a good water rights valuation expert, get his or her employment approved, and arrange for payment by the hour;
- Pay all costs of trial preparation and trial, including deposition fees, opposing counsel's expert witness fees for deposition, jury fees, travel expenses, and the like;
- Convince a judge or jury that the scope of the Davis Firm's employment included opposing the Sale Motion, despite the facts that the Davis Firm was bankruptcy counsel and Debtor and Blanco had separate counsel to represent them in the State Court Action;
- Convince a judge or jury that the price paid for the Debtor's assets was far below their actual value, and that the Receiver could have found another utility company buyer that would pay a lot more than Doña Ana Water;
- Convince a judge or jury that the 1876 AFY of inchoate water rights had a substantial value, even though there is credible expert testimony that they have little value;
- Convince a judge or jury that if the Davis Firm had actively opposed the sale to Dona Ana Water, Judge Martin would not have approved the sale;
- Convince a judge or jury that the Davis Firm breached its duties to the Debtor by failing to vigorously oppose the sale, even though Blanco agreed to the sale;
- Convince a judge or jury that the Davis Firm could have mounted a successful opposition to the Receiver's Sale Motion in the 17 days between the date the Court entered its abstention order and the date of the final hearing in state court;
- Convince a judge or jury that Judge Martin would have allowed the Davis Firm to actively participate in the final hearing on the Sale Motion, if it had been made clear that the firm was going to vigorously litigate in opposition to the Sale Motion;
- Convince a judge or jury that Blanco expected the Davis Firm to weigh in on the Sale Motion, when there is no evidence of that in the record;
- Convince a judge or jury to accept Blanco's testimony rather than the Davis Firm's; and
- Prevail on any appeals.

It is possible the Trustee could clear every hurdle and end up with a lot of cash. In the opinion of the Court, however, such an outcome is unlikely. More likely is that the litigation

-10-

would cost a lot of money and be settled for little or no net recovery. There is some chance, moreover, that the lawsuit would end in a jury verdict against the Trustee, resulting in an administratively insolvent estate.

This factor weighs in favor of settlement.

      b.  <u>Collection Risk</u>. If the trustee were successful in a suit against Davis, collection of some portion of a judgment likely would not be difficult because of Davis's professional liability insurance. The amount of that insurance, however, is not part of the record, nor is whether the insurance policy is a "pac-man" policy. Net insurance coverage could range from $500,000 to several million dollars. This factor weighs against the settlement, but to an unknown extent.

      c.  <u>Complexity and Expense</u>. The malpractice claim against the Davis Firm is not straightforward. Whether or not Davis had a duty to object to the Sale Motion is debatable. The value of the inchoate water right is uncertain, as is whether the Debtor can claim more than 384 AFY of perfected water rights. Could the inchoate water rights be severed and sold to a third party, or must they accompany the 384 AFY of perfected rights? Can inchoate water rights be leased? What would Judge Martin have done with the Sale Motion had Davis objected? Is the Receiver limited to selling the utility assets to someone who will operate a utility? If so, how does that affect the price? Was it negligent for Davis to assume that Mr. Chisholm was given the job of dealing with the Sale Motion? What if Blanco never asked Davis to object to the Sale Motion? How important is Blanco's credibility? Complications and uncertainties abound.

Further, as set forth above litigation of the claim would be expensive, possibly requiring the retention of three professionals—two lawyers and a water rights expert—billing by the hour.

-11-

Pre-trial preparation and depositions would cost a lot and a trial, especially a jury trial, would be very expensive. The expenses of taking the case through trial could possibly exceed the funds in the estate.

There is also the problem of delay. Taking the case through trial and all appeals would take years. The Trustee likely would not be able to make any distributions to creditors until the final appeal had been resolved in his favor and the judgment paid.

Based on the complexity of the claim, the expense to litigate it, and the time it would take to complete the litigation, this factor weighs in favor of settlement.

d. <u>Interests of Creditors</u>. No creditors objected to the settlement. The Trustee testified that he spoke with counsel for one of the major creditors in this case when determining whether or not to settle with the Davis Firm, so the Court assumes that at least one large creditor supports the settlement. Based upon the risks, expense, and delay involved in pursuing the litigation, the Court finds that the best interests of creditors would be served by approving the settlement. This factor weighs in favor of settlement.

Taken as a whole, three of the four *Kopexa* factors weigh decidedly in favor of settlement, while one weighs (although to an extent that is hard to quantify) against it.

### III. CONCLUSION

Giving the Debtor and Blanco the benefit of the doubt, the Court holds that they have standing to object to the proposed settlement. On the merits, the Court holds that the settlement is well within the range of reasonableness, and should be approved. The Trustee negotiated a substantial discount from the Davis Firm's initial fee request, which fully compensates the estate for the settlement of the weak, expensive malpractice claims against the Davis Firm. A separate order will be entered approving the settlement.

-12-

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: July 31, 2015

Copies to:

Clarke C. Coll
P.O. Box 2288
Roswell, NM 88202

Samuel I. Roybal
500 Marquette, NW, Ste 650
Albuquerque, NM 87102

Dori E. Richards
6605 Uptown Blvd. Ste. 280
Albuquerque, NM  87110

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Ronald Andazola
P.O. Box 608
Albuquerque, NM 87103